A 91 (Rev. 5/85) Criminal Complaint

# United States District Court
### DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | AFFIDAVIT |
| FAHEEM MOUSA SALAM | Case number: |
| | UNDER SEAL |

I, Special Agent James Dormuth, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

## I. OBJECTIVE

1. This affidavit is presented in support of a criminal complaint against and arrest warrant for Faheem Mousa Abdel Salam (hereinafter "SALAM"), the defendant, charging him with offering to bribe a foreign official in violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2(i).

## II. CREDENTIALS

2. This affiant is a Special Agent with the Office of the Special Inspector General for Iraq Reconstruction (SIGIR). SIGIR is a federal agency mandated with the oversight responsibility for the use, and investigation of the potential misuse, of the Iraq Relief and Reconstruction Fund (IRRF). Previously, I served thirty years as a United States Postal Inspector for the United States Postal Inspection Service. I received training and have experience in investigating federal crimes, including fraud and internet crime. I also maintain the designation of certified fraud examiner with the Association of Certified Fraud Examiners. I

have received training in general law enforcement and in specialized areas including cyber investigations, and crimes committed utilizing computers and computer networks.

### III. SOURCE OF EVIDENCE

3. Affiant is familiar with the facts and circumstances of this investigation. The facts and information contained in this affidavit are based on the affiant's personal knowledge and observations; review of records and documents obtained during this investigation; information received from other law enforcement officers; and information gained through the affiant's training and experience. Since this affidavit is being submitted for the limited purpose of supporting a criminal complaint and arrest warrant, I have not included every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause that the defendant named herein has violated the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-1, *et seq.*, pertaining to the bribery of a foreign official.

4. Certain facts set forth in this affidavit are based upon information provided by a senior Iraqi police force official (hereinafter referred to as "Confidential Informant" or "CI"). As the scope of the potential illegal activity could extend beyond the target of this investigation, and could include other Iraqi officials, revealing the identity of the CI could jeopardize the safety of the CI. The reliability of the CI has been established through extensive interaction between the CI and United States officials in Iraq. The credibility of the CI's information has been corroborated through consensual monitoring by U.S. law enforcement officials of telephone calls between the CI and the defendant SALAM. In addition, information from the CI has also been corroborated by United States undercover law enforcement officials investigating the allegations.

## IV. RELEVANT STATUTE AND PARTIES

### (A) The Foreign Corrupt Practices Act

5. The Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §§ 78dd-1, *et seq*., (hereafter, the "FCPA") was enacted by Congress for the purpose of, among other things, making it unlawful for United States persons, businesses, and residents, directly or indirectly through an agent, to use any means or instrumentality of interstate or foreign commerce, including the United States mails, in furtherance of an offer, promise, authorization, or payment of money or anything else of value to a foreign government official to obtain or retain business for, or direct business to, any person.

6. Title 15, United States Code, Section 78dd-2(i)(1), states, in pertinent part, that: "It shall also be unlawful for any United States person to corruptly do any act outside the United States in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to any of the persons or entities set forth in paragraphs (1), (2), and (3) of subsection (a), for the purposes set forth therein, irrespective of whether such United States person makes use of the mails or any means or instrumentality of interstate commerce in furtherance of such offer, gift, payment, promise, or authorization." Title 15, United States Code, Section 78dd-2(i)(2) defines a "United States person" as a "national of the United States (as defined in section 101 of the Immigration and Nationality Act (8 U.S.C. § 1101))...." In turn, Title 15, United States Code, Section 78dd-2(a) prohibits the "offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value

to–(1) any foreign official for purposes of– (A)(i) influencing any act or decision of such foreign official in his official capacity...or (B) inducing such foreign official to use his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality, in order to assist such domestic concern in obtaining or retaining business for or with, or directing business, to any person."

**(B)   CI's Status**

7.     The CI is an Iraqi citizen living in Baghdad, Iraq.  The CI is a senior official with the Iraqi Police, the Iraqi Border Guard, and the Iraqi Special Police (hereinafter collectively referred to as the "Iraqi Police Force").  The CI is, therefore, a "foreign official" as that term is defined in 15 U.S.C. § 78dd-2(h)(2).

**(C)   SALAM's Status**

8.     SALAM is a United States naturalized citizen, employed by Titan Corporation, and living in Baghdad, Iraq.  As such, he is a "United States person" as that term is defined in 15 U.S.C. § 78dd-2(i)(2).

**V.   FACTUAL BACKGROUND**

9.     On or about January 2, 2006, Special Agent Robert A. Gorini, a SIGIR agent located in Iraq, initiated this investigation based upon information provided by the CI.  The CI reported to Special Agent Gorini that Faheem ("Mousa" or "Mike" or "Mohammad") Salam, an individual working as a translator for a United States contractor in Iraq, had recently offered the CI a bribe to induce him to use his position with the Iraqi Police Force to facilitate the proposed sale of a map printer and 1,000 armored vests.

10.    SIGIR's investigation of the CI's allegations included: (1) examining the

Iraqi Police Force's contracting and procurement process for purchasing materials; (2) consensually monitoring conversations between the CI and SALAM; (3) using an undercover agent posing as an American national working abroad; and (4) reviewing SALAM's security clearance application and supporting documentation to confirm that SALAM is a naturalized United States citizen. Based on the investigation, there is probable cause to believe that SALAM's offer to bribe the CI constitutes a violation of 15 U.S.C. § 78dd-2(i).

    **(A)**     **The Iraqi Police Force Procurement Process**

11.     The United States government provides financial assistance to the Iraqi Police Force through the Iraq Relief and Reconstruction Fund (IRRF).

12.     Funds from the IRRF for the Iraqi Police Force are provided to and administered by a multinational organization entitled the Civilian Police Assistance Training Team (CPATT). CPATT is tasked with training, mentoring, and equipping the Iraqi Police Force. In this role, CPATT is responsible for ordering and supplying materials to the Iraqi Police Force. To obtain supplies, the Iraqi Police Force submits a requisition to CPATT. CPATT purchases the materials and delivers the acquired materials to the forces.

13.     One of the CI's employment responsibilities includes the management of materials requisitioned from CPATT for the Iraqi Police Force.

14.     SIGIR is a United States agency that oversees funds dispersed by the United States from the IRRF. As a significant portion of CPATT's funding comes from the IRRF, SIGIR investigates allegations of fraud, waste, and abuse associated with

supplies distributed by CPATT.

**(B)     Details of the Investigation**

15.     Based on the investigation, United States law enforcement officials involved believe that SALAM's scheme to bribe the CI was initiated no later than on or about December 12, 2005. On or about December 12, a high-ranking Iraqi Ministry of Interior official introduced SALAM to the CI. The Ministry official informed the CI that SALAM was a translator for a United States contractor in Iraq. During the introduction, the Ministry official suggested to the CI that doing business with SALAM could be "beneficial" to SALAM and the CI. After the Ministry official left, the CI spoke to SALAM alone. During the conversation, SALAM offered to give the CI a $60,000 "gift" if the CI would arrange for CPATT to purchase from SALAM a map printer and 1,000 armored vests. SALAM suggested the total cost for the proposed transaction would be $1,090,000 ($90,000 for the printer and $1,000 for each of the vests). The CI listened to SALAM's proposal but stated he needed time to consider the offer.

16.     On or about January 2, 2006, SALAM contacted the CI by telephone to discuss the proposed transaction. In an effort to secure the contract, SALAM offered to reduce the total cost of the armored vests to $800,000 (i.e., $800 for each vest). SALAM added that as a result of the reduction in the cost of the vests, SALAM's "gift" to the CI would be reduced to $50,000.

17.     After the January 2, 2006, telephone call, the CI contacted SIGIR officials to report SALAM's conduct. SIGIR officials met with the CI, discussed the case, and

thereafter initiated the present investigation.[1]

18.     On or about January 3, 2006, the CI agreed to participate in a consensually monitored telephone conversation with SALAM. SIGIR agents monitored and recorded the conversation. During the conversation, SALAM again requested that the CI arrange for the purchase of the map printer and the armored vests. In an attempt to finalize the transaction, SALAM suggested he could further reduce the price of the vests and similarly reduced his proposed "gift" to the CI to $30,000.

19.     During the monitored and recorded conversation, the CI requested additional information regarding how SALAM anticipated structuring the transaction. SALAM specified that for contracting purposes, the CI should identify the seller of the supplies as "Al-AQSA Company" or the "ALATAWI Group." SALAM suggested that they could further negotiate the details of the transaction by electronic mail ("email"). SALAM stated that his email address was f_salam2000@yahoo.com.

20.     On or about February 1, 2006, the CI contacted SALAM via email to notify SALAM that he would arrange for CPATT to acquire the map printer and the armored vests. The CI advised SALAM "to be prepared" as the process would move forward.

21.     On or about February 3, 2006, Special Agent Michael DuBois, an Agent with SIGIR acting with authorization from CPATT to initiate an undercover operation, sent an email to SALAM posing as a Procurement Officer for CPATT. Special Agent DuBois introduced himself, stated he was directed by the CI to assist with the acquisition

---

[1] The steps taken by the CI after January 2, 2006, as described herein, were taken at the direction of SIGIR agents.

of the map printer and the armored vests, and suggested that he meet SALAM in person.

22.     On or about February 4, 2006, Special Agent DuBois sent a second email to SALAM requesting that they meet in person to discuss the transaction.

23.     On or about February 5, 2006, Special Agent DuBois received an email from the f_salam2000@yahoo.com email account. In the email, SALAM suggested that they meet on February 6, 2006, at the Embassy Palace in Baghdad, Iraq.

24.     On or about February 6, 2006, Special Agent DuBois met SALAM at a predetermined location at the Embassy Palace in Baghdad, Iraq. During the conversation, SALAM and Special Agent DuBois negotiated prices for the map printer and the 1,000 armored vests. SALAM's final offer for the deal was $92,000 for the printer and $600 for each vest. SALAM also offered Special Agent DuBois personally $28,000 to $35,000 to process the contracts. SALAM wrote down the figures on a piece of paper and handed it to Special Agent DuBois. Special Agent DuBois retained the paper and it is presently being held in evidence in Iraq. When Special Agent DuBois asked how the "gift" would be made, SALAM responded that the money could be paid in cash or wired to anywhere Special Agent DuBois desired.

25.     During the February 6, 2006 conversation, Special Agent DuBois obtained detailed information regarding the manufacturer and the series number of the printer and requested that he be allowed to inspect a sample of the armored vests before processing the transaction. SALAM escorted Special Agent DuBois to a Nissan pickup truck parked nearby to view one of the armored vests inside the car. While Special Agent DuBois examined the vest, SALAM spoke about the level of trust they were creating and

suggested that they could do more business together in the future. Special Agent DuBois suggested they could make more money by cutting out the middle man and SALAM agreed.

26.     During the February 6, 2006 conversation, SALAM indicated he would be interested in doing more business together. SALAM stated that he could supply a large range of items including cars and trucks. Special Agent DuBois concluded the conversation by telling SALAM that he was going to process the transaction for the printer and the armored vests as soon as possible. Special Agent DuBois noted that there were some additional details to be finalized but those could be addressed via email. SALAM agreed and encouraged Special Agent DuBois to process the transaction expeditiously.

27.     On or about February 8, 2006, Special Agent DuBois emailed SALAM and thanked him for meeting with him. Special Agent DuBois noted that he was processing the paperwork but he would be in contact soon to obtain additional information to complete the contract documents.

28.     On or about February 8, 2006, SALAM responded to Special Agent DuBois' email and requested that the process be expedited. SALAM suggested that they meet for coffee to finalize the transaction.

29.     On or about February 15, 2006, SALAM and Special Agent DuBois met for a second time at the Embassy Palace in Baghdad, Iraq. During the conversation, they again agreed on the same sale price for the printer and the armored vests ($92,000) and a "gift" to Special Agent DuBois in the amount of $28,000 to $35,000. Special Agent

DuBois requested that he receive some money immediately for processing the paperwork. SALAM stated he could give him $100.00 upon the completion of the paperwork and would provide the additional funds after the transaction was complete.

30.     On or about February 16, 2006, Special Agent DuBois received an email from the f_salam2000@yahoo.com account. The email, ostensibly from SALAM, stated he had "bad news" and would not be able to go forward with the transaction. No information was provided regarding the reason for the decision.

31.     SALAM is described as a twenty-eight year old male, weighing approximately 160 pounds, 6 feet, 2 inches tall, with brown eyes and black hair.

32. SIGIR agents have reviewed security clearance application materials submitted by the defendant SALAM in connection with his employment with Titan Corporation. In those application materials, SALAM is identified as a naturalized United States citizen.

## VI.  CONCLUSION

33.     Based on the foregoing, affiant respectfully submits that there is probable cause to believe that SALAM has engaged in the crime of offering a bribe to a foreign official to influence and induce the official to use his position with a foreign government to direct business to SALAM.

34.     Wherefore, affiant respectfully requests that a complaint and a warrant be issued authorizing the arrest of SALAM for the above-stated violation of the Foreign Corrupt Practices Act, Title 15, United States Code, § 78dd-2(i).

        _____
        James Dormuth
        Special Agent
        Office of the Special Inspector General
         for Iraq Reconstruction

Subscribed and sworn to before

me this _____ day of March, 2006.


_____
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLUMBIA